UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY CONTRERAS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>PORTFOLIO RECOVERY ASSOCIATES, LLC,<br><br>    Defendant. | Case No. 15-cv-00104-JSC<br><br>**ORDER RE: SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 45, 48 |

This case concerns alleged harassing phone calls by Defendant Portfolio Recovery Associates, LLC ("Defendant") to Plaintiffs' home concerning the outstanding debt of Rosemary Contreras. Plaintiffs allege Defendant made 383 phone calls to Plaintiffs' home and family in violation of the Fair Debt Collection Practices Act ("FDCPA") and the Rosenthal Act. Plaintiffs also plead California common law claims: intrusion upon seclusion and negligent training. Now before the Court is Defendant's motion for summary judgment. Having carefully reviewed the parties' briefs, evaluated the evidence, and having had the benefit of oral argument on July 6, 2017, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment.

**BACKGROUND**

In around 2009 Ms. Contreras decided to cancel her Lane Bryant credit card by paying the final balance at a Lane Bryant store. (Dkt. No. 49-3 at 9:7-10, 7:4-9, 10:16-20[1].) Ms. Contreras believed she owed $170, but she learned from a Lane Bryant employee that the card balance was $500. (*Id*. at 7:10-13, 8:2-5.) In light of this new information Ms. Contreras decided to make the minimum payment due at that time, approximately $25. (*Id*. at 8:17-21.)

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

In 2012, Ms. Contreras began receiving correspondence from Defendant stating that she owed at least a thousand dollars. (*Id*. at 11:7-25, 12:11-14.) Ms. Contreras called Defendant to inquire about the letters. (*Id*. at 13:17-21.) Around this time, Defendant was also calling Plaintiff in an attempt to collect the debt. (Dkt. No. 13:19-21.) During this first call to Defendant, Plaintiff stated that she had reached out to Lane Bryant and World Financial to resolve what she believed were inaccuracies with her bill, but they were not willing to work with her and informed her that her account had been sold to Defendant. (*Id*. at 14:1-4.)

During what was either the first or second call to Defendant, Ms. Contreras stated that she believed Defendant was inflating how much she owed, and instead offered to pay $200 - the amount she thought she owed plus interest. (*Id*. at 15:11-20.) On July 30, 2013, Plaintiff made a third call to Defendant and was transferred to a supervisor. (*Id*. at 17:5-11; Dkt. No. 49-1 at 2:13-14.) Ms. Contreras again offered to pay $200, however the supervisor instead proposed that Ms. Contreras immediately pay $700 to settle the debt. (Dkt. No. 49-3 at 18:3-13.) Ms. Contreras tried to explain that she didn't owe that much and that should would be willing to pay the $200 because that amount would likely satisfy the debt. (*Id*. at 19:2-5.) The supervisor replied that if Ms. Contreras did not pay, he would contact her husband and "I could start garnishing your husband's wages." (*Id*. at 19:12-16.) Ms. Contreras felt threatened that Defendant was willing to "dig within [her] marriage" and "get in between [her] relationship with [her] husband" even though she was attempting to resolve the debt with Defendant. (*Id*. at 19:17-21.)

It became a shouting match. (*Id*. at 20:13-14.) Ms. Contreras told the supervisor that he was speaking to her in an unprofessional manner. (*Id*. at 20:15-16.) She was appalled by the way the supervisor was speaking to her. (*Id*. at 20:17-18.) Ms. Contreras felt like it was personal, and that the supervisor "made sure that [she] knew it was personal." (*Id*. at 20:20-21.) The supervisor said that "no matter what [Ms. Contreras] did to try to resolve, no matter how many phone calls [Ms. Contreras] makes, how many complaints that [Ms. Contreras] complained, no matter who [Ms. Contreras] talked to above him, he'd still be there tomorrow." (*Id*. at 20:22-21:2.)

Ms. Contreras then asked Defendant to not send her any more correspondence, call her home, or call her family. (*Id*. at 21:2-5.) Ms. Contreras felt like she had to defend herself because

she felt personally threatened. (*Id*. at 21:5-7.) The supervisor continued yelling that she still owed Defendant money. (*Id*. at 21:7-8.) The supervisor stated that if Ms. Contreras thought this is bad now, he was going to make sure she got a lot of calls from Defendant. (*Id*. at 22:19-23.) The supervisor laughed at Ms. Contreras, but did not curse or call her names. (*Id*. at 23:6-8, 24:11-25.)

After the third conversation with Defendant, Ms. Contreras did not speak to Defendant when it called--she would either hang up or say "don't call me" or "don't call this home." (*Id*. at 26:16-19, 27:1.) Plaintiffs received a total of approximately 383 calls between October 2012 and January 2015. (Dkt. No. 49-4 at 10:17-24, *Id*. at 11:2-12:14.) The volume of the calls became too much for Ms. Contreras to bear. (Dkt. No. 49-3 at 31:15-16.) She would take the "phone off the receiver and unplug it, hang up, answer, hang up - it was exhausting." (*Id*. at 31:16-19.) Ms. Contreras felt that the calls were constantly interfering with her home and her family's time. (*Id*. at 31:11-12.)

The calls were typically every 30 minutes, however on one particular day the calls occurred with greater frequency at every 10 minutes. (*Id*. at 33:6-11.) Ms. Contreras got so upset she started banging her phone down and broke the receiver. (*Id*. at 33:11-13.) Ms. Contreras did it because she "couldn't get no more phone messages on there…I didn't want to hear from them, I didn't want to hear their voice, I didn't want to hear nothing." (*Id*. at 33:13-16.)

Of the 383 calls, Ms. Contreras and her husband received calls twice a day on 91 occasions, three times a day on 11 occasions, and four times a day on 7 occasions. (Dkt. No. 49-1 at 2:11-13.) Defendant also called Plaintiffs' children, with 35 calls to their son, who was a minor at the time, and 16 calls to their daughter. (*Id*. at 2:15-17.) Defendant's last call to Ms. Contreras was on her cell phone in 2015. (Dkt. No. 49-3 at 28:10-15.)

**DISCUSSION**

Defendant moves for summary judgment on Plaintiffs' nine FDCPA claims, Sections 1692(a)(1), 1692d, 1692d(2), 1692d(5), 1692e, 1692e(5), 1692e(10), 1692f, and 1692f(1), and four provisions of the Rosenthal Act, Sections 1788.10(f), 1788.11(d), 1788.11(e), and 1788.17.

As Plaintiffs confirmed at oral argument, they have abandoned their claims under FDCPA Sections 1692(a)(1), 1692c, 1692e, and 1692f and Rosenthal Act Section 1788.10(f) and

3

1788.11(e). (Dkt. No. 49 at 7:22-8:1); accordingly the Court grants Defendant summary judgment on these claims. Plaintiffs thus have two remaining FDCPA Section 1692d claims (1692d(2) and 1692d(5)) and two remaining Rosenthal Act claims (Sections 1788.11(d) and 1788.17).

**I.     Fair Debt Collection Practices Act ("FDCPA")**

"[T]he FDCPA is a remedial statute aimed at curbing what Congress considered to be an industry-wide pattern of and propensity towards abusing debtors." *Clark v. Capital Credit & Collection Services, Inc.,* 460 F.3d 1162, 1171 (9th Cir. 2006). It imposes liability and both statutory and actual damages for a wide range of abusive and unfair practices. *Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010). Because the FDCPA is a remedial statute, it is construed liberally in favor of the consumer. *Id*. at 1033-34.

**A.     *FDCPA Section 1692d(2)***

"A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Section 1692d(2) prohibits "[t]he use of obscene or profane language or language the natural consequence of which is to abuse the hearer or reader." 15 U.S.C. § 1692d(2). A reasonable trier of fact could find that Defendant's supervisor's call with Ms. Contreras in July 2013 used "language the natural consequence of which is to abuse the hearer or reader." This call, however, occurred outside the one year statute of limitations. 15 U.S.C. § 1692k(d). The continuing violations doctrine does not apply as the call is a discrete act; indeed, the two cases cited by Plaintiffs establish that it does not apply. *Joseph v. JJ Mac Intyre Cos. LLC*, 281 F.Supp. 2d 1156, 1161 (N.D. Cal. 2003), held that certain acts, like a phone call at midnight, are discrete and therefore the continuing violations doctrine would not apply. *See also Komarova v. National Credit Acceptance, Inc.*, 175 Cal. App. 4th 324, 344 (2009) (noting *Joseph's* description of discrete acts). The July 2013 call is similar to a call at midnight: both are discrete acts. Accordingly, Defendant's motion for summary judgment on the 1692d(2) claim must be granted on the grounds the claim is barred by the statute of limitations.

**B.     *FDCPA Section 1692d(5)***

The FDCPA also prohibits "causing a telephone to ring or engaging any person in

4

telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. § 1692d(5). Summary judgment must be denied because a reasonable trier of fact could find that Defendant caused Plaintiffs' telephone to ring with intent to annoy, abuse or harass any person at the called number. Viewing the facts in the light most favorable to Plaintiffs, a trier of fact could find that Defendant called Plaintiffs 383 times over just more than two years. The calls continued after Ms. Contreras told Defendant not to call anymore. Defendant even called Plaintiffs' children more than 20 times each. On a few occasions there were as many as four calls in a single day. Even if these facts are not sufficient to support a finding of the required intent, the evidence that Defendant's supervisor told Plaintiff in the July 2013 call that, in effect, "we are going to continue to call you until you pay up and there is nothing you can do," certainly supports a finding of intent to annoy, abuse or harass, especially since the calls then continued until this lawsuit was filed.

Defendants' argument that the July 2013 call does not support a finding of intent because Defendant's calls paused for two weeks can be made to the jury. The record evidence does not support the conclusion that every reasonable trier of fact would have to find no intent. Summary judgment is therefore not warranted.

Finally, the Court rejects Defendant's contention that Plaintiffs' retention of an attorney somehow dooms their FDCPA claims. First, there is a genuine dispute as to when Plaintiffs consulted counsel and the nature of the consultation. Second, and more importantly, *Guerrero v. RJM Acquisition*, *LLC*, 499 F. 3d 926 (9th Cir. 2007), does not suggest that a debt collector cannot be found liable for violating the FDCPA for calls made directly to a consumer merely because the consumer has retained counsel.

## II. Rosenthal Act

Plaintiffs are still pursuing claims under Sections 1788.11(d) and 1788.17 of the Rosenthal Act. "California has adopted a state version of the FDCPA, called the Rosenthal Act." *De Amaral v. Goldsmith & Hull*, 2014 WL 572268, at *7 (N.D. Cal. Feb. 11, 2014) (citing *Riggs v. Prober & Raphael,* 681 F.3d 1097, 1100 (9th Cir.2012)). "The Rosenthal Act mimics or incorporates by reference the FDCPA's requirements ... and makes available the FDCPA's

5

remedies for violations." *Id.* "[W]hether [conduct] violates the Rosenthal Act turns on whether it violates the FDCPA." *Id.* Thus, "[t]he Rosenthal Act establishes liability under California law for violations of the FDCPA." *Sial v. Unifund CCR Partner,* 2008 WL 4079281, at *4 (S.D. Cal. Aug. 28, 2008). Section 1788.17 states in relevant part that every creditor attempting to collect a debt must comply with FDCPA Sections 1692b through 1692j, including 1692d. Cal. Civ. Code § 1788.17. Moreover, "[t]he Rosenthal Act's remedies are cumulative and available even when the FDCPA affords relief." *Gonzalez v. Arrow Financial Services, LLC*, 600 F.3d 1055, 1069 (9th Cir. 2011).

Because Plaintiffs have submitted evidence to support a liability finding under FDCPA Section 1692(d)(5), they also have submitted evidence sufficient to establish liability under Section 1788.11(d) of the Rosenthal Act which prohibits "causing a telephone to ring repeatedly or continuously to annoy the person called" as well as liability under 1788.17, which requires creditors to comply with the FDCPA. Cal. Civ. Code §§ 1788.11(d) and 1788.17; *see also De Amaral*, 2014 WL 572268, at *7 (concluding when liability is established under the FDCPA it is also established under the Rosenthal Act).

### III. Intrusion Upon Seclusion

An action for invasion of privacy by intrusion upon seclusion has two elements: (1) an intrusion into a private place, conversation, or matter, (2) in a manner highly offensive to a reasonable person. *Taus v. Loftus,* 40 Cal.4th 683, 725 (2007). To determine whether the first element is satisfied, the plaintiff must have had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source. *Shulman v. Group W Prods., Inc.*, 18 Cal. 4th 200, 231-32 (1998). Whether conduct is "highly offensive to a reasonable person," turns on "the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded." *Hill v. National CollegiateAthletic Ass'n,* 7 Cal.4th 1, 26 (1994).

The California state courts have not addressed whether abusive debt collection calls can constitute a common law invasion of privacy. Defendant argues that they cannot, at least where,

6

as here, the plaintiff could not have had a reasonable expectation that she would not receive collection telephone calls given that she concedes she owed money on the credit card. As support for its argument, Defendant relies on California case law regarding the common law tort of intentional infliction of emotional distress. In *Bundren v. Superior Court*, 145 Cal. App. 3d 784, 789 (1983), for example, the court explained:

> we recognize that the attempted collection of a debt, by its very nature, often causes the debtor to suffer emotional distress. Frequently, the creditor intentionally seeks to create concern and worry in the mind of the debtor in order to induce payment. However, in a society greatly dependent upon the extension of credit, it is important that a creditor be allowed a certain degree of freedom in demanding payment. When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. In the debtor-creditor situation the right of a debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt.

*Bundren v. Superior Court*, 145 Cal. App. 3d 784, 789 (1983) (internal quotation marks and citations omitted). Thus, to prevail on a claim of intentional infliction of emotional distress involving debt collection the plaintiff must show that the creditor went "beyond all reasonable bounds of decency in attempting to collect the debt." *Id.* at 789. Defendant argues that since the facts here are not sufficient for an intentional emotional distress claim, they likewise should not be sufficient for an invasion of privacy claim.

Several federal courts, however, have permitted an invasion of privacy claim based on harassing telephone calls. In *Fausto v. Credigy Services Corp.*, 598 F.Supp.2d 1049 (N.D. Cal. 2009), for example, the court held that the evidence was sufficient to support a finding that the defendant engaged in highly offensive conduct. *Id.* at 1056. In that case, however, the defendant argued only that the evidence was insufficient as to the second element, so the district court did not squarely address the issue raised here: whether the plaintiff had a reasonable expectation of privacy with regard to collection telephone calls. *Id.* Although summary judgment was also denied in *Joseph*, 238 F.Supp.2d at 1179-70, there the court was also not asked to specifically decide whether the first element was satisfied.

In *Inzerillo v. Green*, 2014 WL 6660534, at *5 (N.D. Cal. No. 24, 2014), however, the

7

court specifically considered a creditor's qualified privilege to collect a debt and found that the evidence was sufficient to support a finding of an invasion of privacy given the evidence that the defendant called the plaintiff 98 times, threatened to change the locks on house, and send someone to disturb the tenant.

Here, it is undisputed that Defendant called Plaintiffs 383 times. This includes calls nearly every day from October 2012 to January 2015, including many days with multiple calls. The threatening call, however—the July 2013 call—was initiated by Plaintiff. It is difficult to see how a call initiated by a plaintiff can constitute an invasion of privacy; it may constitute another tort, but not an invasion of the plaintiff's privacy. What is left, then, are hundreds of unanswered calls to Plaintiffs' home, cell phone, and 20 to 30 calls to their children, two thirds of which were made after Defendant warned Ms. Contreras that it would continue to harass her until she paid up. (Dkt. No. 49-4.)

Ultimately, the Court concludes that this is an issue that it should decide based upon the record at trial. Once that evidence is presented, the Court may decide that it is insufficient to support this common law tort. On this paper record, however, the Court cannot make that finding as a matter of law. Accordingly, summary judgment is denied.

## IV. Negligent Training

"California law recognizes the theory that an employer can be liable for negligently hiring, supervising or retaining an unfit employee." *Doe v. Capital Cities,* 50 Cal .App. 4th 1038, 1054 (1996). "Liability for negligent hiring and supervision is based upon the reasoning that if an enterprise hires individuals with characteristics which might pose a danger to customers or other employees, the enterprise should bear the loss caused by the wrongdoing of its incompetent or unfit employees." *Mendoza v. City of Los Angeles,* 66 Cal. App. 4th 1333, 1339 (1998). However, "there can be no liability for negligent supervision 'in the absence of knowledge by the principal that the agent or servant was a person who could not be trusted to act properly without being supervised.'" *Juarez v. Boy Scouts of Am., Inc.,* 81 Cal.App. 4th 377, 395 (2000) (quoting *Noble v. Sears, Roebuck & Co.,* 33 Cal.App.3d 654, 664 (1973)).

Plaintiffs claim this law supports their claim for negligent *training*. In particular, they

contend that the evidence that Defendant trained its employees to make up to four calls a day, and failed to train their employees to refrain from calling when a consumer makes a verbal request to stop calling, as well as the testimony of Defendant's 30(b)(6) witness that they did not train their employees as to how to respond to a "comment by a customer or third party that they are being harassed" (Dkt. No. 49-4 at 17:8-18), support a finding of negligent training. These facts, however, do not fall within the cited common law; namely, where an employer hires someone who is presumably fit for the job, but the employer fails to properly train the employee to lawfully perform the job. The Court therefore declines to follow *Inzerillo v. Green Tree Servicing, LLC*, 2014 WL 660534, at *7 (N.D. Cal. Nov. 24, 2014), which did not explain how the facts of that case fit within the existing common law. Accordingly, Defendant's motion for summary judgment on the negligent training claim is granted.

## V. Administrative Motion to File Under Seal

A party must demonstrate "compelling reasons" to seal judicial records attached to a dispositive motion. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). "[S]ources of business information that might harm a litigant's competitive strategy may also give rise to a compelling reason to seal." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Parties moving to seal documents must comply with the procedures set forth in Civil Local Rule 79-5. The rule permits sealing only where the parties have "establishe[d] that the document or portions thereof is privileged or protectable as a trade secret or otherwise entitled to protection under the law." Civ. L.R. 79-5(b).

Defendants request to file three manuals, Exhibits E, F, and G to the declaration of Tim Rees, under seal. (Dkt. No. 48. at 2:1-8) Exhibit E is a training manual, Exhibit F is a procedural manual concerning Defendant's dispute procedures, and Exhibit G is a policy manual. Defendant states that the information in these manuals provide "insight into Defendant's proprietary collection procedures, policies and techniques, and the internal operations of Defendant." (*Id.* at 2:25-27.) Defendant further submits that it operates its business in "highly competitive, volatile markets and the release of the information contained in these documents could potentially be used by [Defendant's] competitors to Defendant's detriment." (*Id.* at 2:27-3:2.) As such, the Court

9

concludes that public release of Defendant's business manuals might harm its competitive business strategy and therefore gives rise to a compelling reason to seal.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is GRANTED in part and DENIED in part as set forth in this Order. Defendant's administrative motion to file Exhibits E, F, and G to the declaration of Tim Rees under seal is GRANTED.

This Order disposes of Docket Numbers 45 and 48.

**IT IS SO ORDERED.**

Dated: July 12, 2017

*Jacqueline Scott Corley*
JACQUELINE SCOTT CORLEY
United States Magistrate Judge